# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

TIMOTHY TOWNSEND, JR.,
    Plaintiff,

    v.

CASTILLO, et al.,
    Defendants.

No. 3:20-cv-1241 (SRU)

## <u>INITIAL REVIEW ORDER</u>

On August 25, 2020, Timothy Townsend, Jr., currently confined at Cheshire Correctional

Institution and proceeding *pro se*[1] and *in forma pauperis*, filed this complaint under 42 U.S.C. §

1983 against eighteen defendants:  Correctional Officer Castillo, Correctional Officer Comette,

Correctional Officer Clark, Correctional Counselor Elmore, Disciplinary Hearing Officer Davis,

Warden Caron, Deputy Warden Kenny, Deputy Warden McClendon, Director Maiga,

Correctional Supervisor Crandall, Correctional Counselor Hewitt, Warden Butricks, Correctional

Officer Warren, Correctional Officer Berkowski, Correctional Counselor Cooper, Disciplinary

Hearing Officer McNiel, District Administrator Mulligan, and District Administrator Carlos.[2]

Townsend asserts claims for violations of various federal and state constitutional rights,

challenging Carl Robinson Correctional Institution's handling of his privacy complaints as well

as his transfer to Cheshire Correctional Institution.  Townsend seeks declaratory and injunctive

relief in addition to damages.

---

[1] Although Townsend has since been appointed counsel, he was proceeding *pro se* at the time he filed the complaint.
[2] Townsend additionally filed two motions for a preliminary injunction and temporary restraining order. *See* Doc. Nos. 4, 16.  I denied the first as moot; the second remains pending and will be addressed in a separate decision.

## I.   Standard of Review

Under 28 U.S.C. § 1915A, I must review prisoner civil complaints and dismiss any

portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief

may be granted, or that seeks monetary relief from a defendant who is immune from such relief.

*See* 28 U.S.C. § 1915A(b).  Although detailed allegations are not required, the complaint must

include enough facts to afford the defendants fair notice of the claims and the grounds upon

which they are based.  *See Bell Atlantic v. Twombly*, 550 U.S. 544, 555–56 (2007).  In addition,

the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."

*Twombly*, 550 U.S. at 570.  Conclusory allegations will not suffice.  *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).

Nevertheless, it is well-established that "[*p*]*ro se* complaints 'must be construed liberally

and interpreted to raise the strongest arguments that they suggest.'"  *Sykes v. Bank of Am.*, 723

F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474

(2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing

special rules of solicitude afforded to *pro se* litigants).

## II.  Allegations[3]

On December 8, 2019, while Townsend was incarcerated at Carl Robinson Correctional

Institution ("Robinson"), a level three facility, Correctional Officer Castillo issued Townsend a

disciplinary report for disobeying a direct order.  *See* Compl., Doc. No. 1, at 7 at ¶¶ 1, 2, 47.  The

report stated that Townsend was using a shower curtain to shield himself from view while using

the toilet and had refused to comply with a direct order to remove the curtain.  *See id.* at ¶ 3.  It

---

[3] Although the complaint includes a section entitled "Statement of Facts," Townsend includes facts
throughout various other sections of the complaint.  The facts recited here are drawn from all sections of the
complaint, and I assume them to be true and draw all reasonable inferences in Townsend's favor.  *See Ashcroft,* 556
U.S. at 678–79.

further provided that Townsend was given an "informal," which he declined to sign.  *See id.*
Townsend denies that he disobeyed a direct order and contends that he was entitled to proceed
with a disciplinary hearing rather than sign the "informal."  *See id.* at ¶ 4.

Four days later, on December 12, 2019, Correctional Officer Comette issued Townsend a
disciplinary report for disobeying a direct order.  *See id.* at ¶ 7.  Like Castillo's disciplinary
report, Comette's disciplinary report stated that Townsend failed to comply "in an expeditious
manner" with several orders to remove a shower curtain that Townsend had placed over the
bathroom stall.  *See id.* at ¶ 8.  According to the report, Townsend later told Comette that he did
not remove the curtain because he wanted privacy.  *Id.*

At the disciplinary hearing, Townsend argued that no rule barred inmates from retaining
their privacy while performing bodily functions.  *See id.* at ¶ 12.  Disciplinary Hearing Officer
Davis then showed Townsend a provision in the Robinson Inmate Handbook prohibiting the
removal of facility equipment.  *Id* at ¶ 14.  In response, Townsend argued that he was not
afforded adequate notice that the provision covered removable shower curtains and that no
inmate had previously been disciplined for using a shower curtain for privacy purposes.  *See id.*
at ¶ 15.  He also noted that shower curtains were provided in other areas at Robinson in order for
inmates to retain their privacy.  *Id.*

Townsend requested Commissioner Cook as a witness at the disciplinary hearing but
Davis refused to call him.  *See id.* at ¶¶ 21–22.  Correctional Officer Clark and Correctional
Counselor Elmore also declined to interview him, claiming that his testimony would not be
relevant.  *Id.* at ¶ 21.  In addition, Clark, Elmore, and Davis refused to obtain and view the
surveillance footage of the December 8, 2019 incident, which would have revealed that Castillo
did not order other inmates to remove shower curtains.  *See id.* at ¶¶ 11, 20.

Comette's ticket was dismissed but Castillo's ticket was not. *Id.* at ¶¶ 9, 23. Instead, Davis found Townsend guilty of the first disciplinary charge of violating unit rules, and sanctioned him to sixty days loss of phone privileges and ten days loss of good-time credits. *Id.* at ¶¶ 24–25. Townsend complained about the disciplinary decision to Warden Caron, Deputy Warden McClendon, and Deputy Warden Kenny, and asserted that he was not being provided the privacy guaranteed by Administrative Directive 6.12. *See id.* at ¶¶ 18–19. Townsend's aunt also complained to the Commissioner's office about the facility's handling of the bodily privacy issues. *See id.* at ¶ 43.

Moreover, Caron, McClendon, and Kenny had installed cameras in the bathrooms in the dorms at Robinson, which, according to Townsend, violated Administrative Directive 6.12's prohibition against voyeurism. *See id.* at ¶ 31. In addition, the bathrooms were located in an open dorm setting with no doorways or other visual impediments, and the toilets extended out further than the bathroom stall dividers. *See id.* at ¶¶ 33, 40. Accordingly, after receiving the disciplinary tickets, Townsend regularly performed bodily functions in full view of the cameras and the defendants, during which time his private parts were exposed. *Id.* at ¶ 32. Townsend maintains that a July 20, 2017 PREA Audit report, which stated that inmates were able to use the restrooms without being viewed by staff, was therefore inaccurate. *See id.* at ¶¶ 34–38.

Also in December 2019, Assistant Attorney General Carmel Motherway investigated allegations that several staff members, including an imam, were helping Townsend scan, fax, and e-mail documents. *See id.* at ¶ 42. Although the allegations were later deemed to be false, McClendon cautioned the imam not to do anything outside the scope of his responsibilities for Townsend. *Id.*

About one month later, on January 22, 2020, Kenny sent an e-mail to Correctional Supervisor Crandall at the Office of Classification and Population Management, stating that "I was reviewing some incidents and [Townsend's] name keeps coming up. Nothing to substantiate with a DR but the facility is recommending he be transferred in a proactive [sic] measure; we feel he is not suitable for an open compound." *See id.* at ¶ 44. Crandall responded later that day: "He has a hold for the pell grant. Just an FYI." *Id.* at ¶ 45. The hold was removed, and on January 23, 2020, Townsend was transferred to Cheshire Correctional Institution ("Cheshire"), a level four facility. *Id.* at ¶¶ 46, 48. As of the date of his transfer, Townsend was classified as a risk level three inmate. *See id.* at ¶ 47.

At Cheshire, Townsend could no longer enroll in college courses and was subjected to conditions that were more restrictive than those at Robinson, including less out-of-cell leisure and recreation time and fewer programming opportunities. *See id.* at ¶¶ 46, 55–56. Townsend filed a grievance challenging his transfer as punitive and violative of his due process rights and administrative directives. *Id.* at ¶ 50. A month after Townsend appealed his grievance due to a lack of a timely response, Director Maiga responded, stating that placement decisions were "based on security matters and prioritized by the [department's] population management needs." *Id.* at ¶ 51. Maiga also advised Townsend that he was not permitted to appeal the decision to Maiga's supervisor, even though the administrative directive provides otherwise. *See id.* at ¶ 52.

On January 31, 2020, Counselor Supervisor Molina sent an e-mail to school principal Verdi, who apparently had advocated on Townsend's behalf, stating, among other things, that Townsend had "poor institutional adjustment" at Robinson and was transferred as a "routine" general population move. *See id.* at ¶ 62. She also directed Verdi's attention to Townsend's "last two tickets" from Robinson. *Id.* Townsend notes that Administrative Directive 9.1,

however, indicates that a regular transfer should generally be made to a facility with the same classification level as the inmate and to one that meets the inmate's program needs. *See id.* at ¶ 64.

When Townsend was transferred to Cheshire, James Downing—an inmate with whom he had an active separation profile—was also housed at Cheshire; that separation profile stemmed from a violent fight between the two that occurred in November 2005. *Id.* at ¶ 72. All inmate profiles are maintained by the Office of Classification and Population Management and recorded in the Computer Assisted Inmate Transfer ("CAIT") program. *Id.* at ¶ 75.

When Townsend learned that Downing was housed in Cheshire on March 20, 2020, he informed Captain Boyd, who responded that no one with whom he had a profile was confined at Cheshire. *See id.* at ¶¶ 73, 74. Townsend also told Correctional Officer Warren that he feared for his safety because of his profile with Downing. *See id.* at ¶ 86. On April 19, 2020, Warren issued Townsend a disciplinary ticket for refusing housing;[4] Townsend contends that Warren falsely represented that Townsend feared his cellmate rather than Downing. *See id*. at ¶ 87.

Correctional Officer Berkowski called Townsend to the Disciplinary Investigator's office. *Id.* at ¶ 88. There, Townsend demanded all evidence—a request Berkowski denied—and Correctional Counselor Cooper as his advisor, a request Berkowski granted. *Id.* Townsend later asked Cooper to obtain a statement from Downing but Cooper refused, explaining in part that the investigator did not believe Downing's testimony was relevant and ordered her not to interview him. *See id.* at ¶ 89. Berkowski also denied Townsend's request to have Downing as a witness. *See id.* at ¶ 90.

---

[4] In a separate paragraph of his complaint, Townsend alleges that he told Warden Butricks that he feared for his safety in the general population because he was housed with someone with whom he had a safety profile, and that he was thereafter given a disciplinary report for refusing housing on the ground that he feared his cellmate. *See id*. at ¶ 77. I presume that the disciplinary report is the same report to which Townsend refers above.

At the hearing, Townsend was found guilty of the charge of refusing housing; the decision was upheld on appeal. *Id.* at ¶¶ 92–95. Townsend received sanctions of fifteen days in restrictive housing and fifteen days' loss of good time credits. *See id.* at ¶ 113. The conditions in restrictive housing were more onerous than in general population in the following ways: Townsend was permitted five hours of recreation per week instead of twelve, no outside recreation, no desk, chair, or shelves in the cell, no chicken legs during meals, no personal property, no telephone use, no social visits, no laundry service, showers three times per week instead of twelve, in-cell meals, no religious services, a small recreational area, and no inmate contact. *Id.* at ¶ 114.

Once Townsend was released from restrictive housing, he was moved to the north side of the facility, away from Downing, but was not transferred out of the prison. *See id.* at ¶ 97. Inmates relayed to Townsend threatening messages from Downing, and Townsend was warned that he would return to restrictive housing and be reviewed for protective custody if he complained. *Id.* at ¶ 81. Townsend also saw Downing twice and had to run back to his housing unit each time to avoid a confrontation. *Id.* at ¶ 116. He told Butricks, but nothing was done to protect Townsend. *Id.* Townsend also told Butricks that he needed to transfer Townsend to resolve the issue, to which Butricks responded that he would transfer Downing instead of Townsend if necessary. *See id.* at ¶ 81. Butricks additionally told Townsend that no facility wanted to house Townsend because of "his reputation for filing lawsuits." *Id.* at ¶ 83.

Townsend avers that Caron, McClendon, and Kenny arranged his transfer to a higher security facility in retaliation for his and his aunt's complaints about the facility's handling of the bodily privacy issues as well as for the investigation by AAG Motherway. *Id.* at ¶¶ 43, 49. Townsend further alleges that Maiga, Crandall, and Hewitt knew that Townsend had a separation

profile with an inmate at Cheshire but nonetheless approved his transfer to Cheshire and deleted the profile from the CAIT system after Townsend began complaining about the transfer. *Id.* at ¶ 76. Moreover, from March 13, 2019 through March 19, 2019, Maiga, Hewitt, and Crandall transferred Townsend to four different facilities where other prisoners or staff with whom he had separation profiles were situated. *See id.* at ¶ 78. Townsend contends that they punitively transferred him to those facilities so that he would be placed in restrictive housing, which was the outcome in three of the four facilities. *See id.* at ¶¶ 79, 80.

### III.   Discussion

#### A.   Joinder of Claims

Federal Rule of Civil Procedure 20 permits joinder of multiple defendants in one action only if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions and occurrences, and any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). "What will constitute the same transaction or occurrence under the first prong of Rule 20(a) is approached on a case by case basis." *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008) (citation omitted).

"In construing the term 'transaction or occurrence' under Rule 20, many courts have drawn guidance from the use of the same term in Rule 13(a), applying to compulsory counterclaims." *Barnhart v. Town of Parma*, 252 F.R.D. 156, 160 (W.D.N.Y. 2008) (citation omitted). As the Second Circuit has observed in the Rule 13 context, whether a counterclaim arises out of the same transaction as the original claim depends upon the logical relationship between the claims and whether the "essential facts of the various claims are so logically

connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir. 1978).

Applying the foregoing principles, I conclude that the requirements for joinder have not been satisfied here with respect to all of the claims that Townsend has brought. Townsend's Fourth Amendment privacy claim and his due process claim pertaining to the December 2019 disciplinary tickets arose out of conditions and events that do not share common questions of law or fact with his other claims. By contrast, his First Amendment and due process claim relating to the transfer to Cheshire, as well as his due process claim relating to the disciplinary process for his "refusing housing" ticket and his Eighth Amendment deliberate indifference claim, arose out of a series of related transactions.

Moreover, most defendants are implicated in only one set of claims. Castillo, Comette, Clark, Elmore, and Davis were involved only in the claims arising out of the events surrounding the shower curtain incidents; Butricks, McNiel, Warren, Cooper, Berkowski, Carlos, Mulligan, Maiga, Crandall, and Hewitt were involved only in the claims arising out of Townsend's transfer and difficulties at Cheshire. There is also little factual overlap between those two sets of claims. The Fourth Amendment claim centers on the privacy conditions at Robinson, and the due process claim focuses on the disciplinary process for the 2019 tickets. The remaining claims, in contrast, are grounded on the transfer to Cheshire that followed Townsend's complaints about the lack of privacy and on other events that occurred at Cheshire.

For the above reasons, I conclude that the claims stemming from the shower curtain incidents and the claims stemming from the transfer to Cheshire and Townsend's confinement there do not "aris[e] out of the same transaction, occurrence or series of transactions and

occurrences," and that some of the defendants have been improperly joined in violation of Federal Rule of Civil Procedure 20.  Fed. R. Civ. P. 20(a)(2)(A).

"Once the court has determined that the parties are improperly joined, it has broad discretion to sever parties or claims from the action."  *Wilson v. McKenna*, 2015 WL 1471908, at *6 (D. Conn. Mar. 31, 2015); Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party."). Because Townsend has filed two motions for preliminary injunctive relief relating to his transfer to and the conditions in Cheshire, one of which I have already ruled on, I will sever and **dismiss without prejudice** the claims relating to the shower curtain incidents and resultant discipline and permit the claims regarding the transfer to Cheshire and Townsend's confinement there to proceed here.  Townsend may file a separate lawsuit if he wishes to pursue the claims arising out of the shower curtain incidents at Robinson.

### B.   Retaliatory Transfer Claim

Townsend asserts a First Amendment retaliation claim against Warden Caron, Deputy Warden McClendon, and Deputy Warden Kenny, contending that they arranged his transfer to a higher security facility in retaliation for his and his aunt's complaints about the lack of privacy at Robinson and for AAG Motherway's investigation.  *See id.* at ¶¶ 43, 49.  That claim is colorable.

To state a retaliation claim, Townsend must allege facts showing:  "(1) that the speech or conduct at issue was protected, (2) that the defendant[s] took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018) (internal citations omitted).  The Second Circuit has instructed courts to approach prisoners' retaliation claims "with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison

official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)).  A prisoner pursuing a retaliation claim must not rest on "wholly conclusory" allegations but rather must allege "specific and detailed" supporting facts.  *Id.*

In this case, Townsend has sufficiently pled each of the three elements.  First, Townsend alleges that, during his disciplinary hearing in December 2019, he argued that there was no rule that prohibited inmates from retaining their privacy while using the toilet.  *See* Compl., Doc. No. 1, at ¶ 12.  Townsend also raised complaints to other correctional officials—namely, Caron, McClendon, and Kenny—about the disciplinary decision and about not being afforded the privacy protections guaranteed by Administrative Directive 6.12.  *See id.* at ¶¶ 18–19.

Those complaints, which challenge the conditions of confinement and were elevated to prison officials, can qualify as protected speech.  *See, e.g.*, *Garcia v. Semple*, 2019 WL 5597771, at *17 (D. Conn. Oct. 30, 2019) ("Although, not all oral speech by an inmate constitutes protected activity, some courts within the Second Circuit have determined that oral complaints about the conduct of prison officials or conditions of confinement may constitute protected speech in the context of a First Amendment retaliation claim.") (citing *McIntosh v. United States*, 2016 WL 1274585, at *26 (S.D.N.Y. Mar. 31, 2016) (collecting cases)); *New York State Dep't of Corr. Servs.*, 2011 WL 4357375, at *6 (S.D.N.Y. Sept. 16, 2011) ("There can be little doubt that [a prisoner's] informal complaints and formal grievances constitute protected activity under the First Amendment.") (citing *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996)).  Accordingly, Townsend has adequately pled the first element.

With respect to the second element, the Second Circuit has held that "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Wrobel v. County of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) (citation omitted).  "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d 489, 493 (2d. Cir. 2001).

Courts consider the circumstances of the particular case when evaluating the second element. *Id.* (noting that the definition of adverse action "is not static across contexts," but "must be tailored to the different circumstances in which retaliation claims arise") (citation omitted).  Significantly, "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse."  *Id.* (internal alteration and citation omitted).  Further, as relevant here, the Second Circuit has concluded that the transfer of an inmate to another prison facility—even to a facility with comparable conditions—may constitute an adverse action for purposes of a First Amendment retaliation claim.  *See Smith v. Levine*, 510 F. App'x 17, 21 (2d Cir. 2013) ("We had stated, at least as early as 1998, that, while '[a] prisoner has no liberty interest in remaining at a particular correctional facility,' prison authorities 'may not transfer an inmate in retaliation for the exercise of constitutionally protected rights.'") (citing *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998)).

Applying those principles, I conclude that the complaint raises a plausible inference that Townsend was subjected to an adverse action, thus satisfying the second element.  According to the complaint, Townsend was transferred to a facility that maintained harsher conditions and that

12

housed an inmate with whom Townsend had an active separate profile.  In my view, a transfer of that nature would deter a prisoner from exercising his or her First Amendment rights.

Finally, Townsend has sufficiently articulated a causal connection between his complaints about the lack of privacy at Robinson and the transfer to Cheshire.[5]  Although the complaint does not specify when he lodged the complaints in question, he presumably did so after he received his second disciplinary ticket, which was on December 12, 2019.  His transfer to Cheshire was effected just over a month later, on January 23, 2020.  Temporal proximity, although not sufficient to state a retaliation claim, supports the existence of a causal connection. *See Jumpp v. Terranova*, 2016 WL 2858775, at *2 (D. Conn. May 16, 2016).

In addition to temporal proximity, Townsend avers that at least one of the defendants made statements that could suggest retaliatory intent.  *See Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (considering "statements by the defendant concerning his motivation" in causation analysis).  For instance, Townsend alleges that Warden Butricks advised him that no facility wanted to house Townsend because he filed lawsuits.  *See* Compl., Doc. No. 1, at ¶ 83.[6] Drawing all inferences in Townsend's favor and construing the complaint liberally, I conclude that the foregoing raises a plausible suggestion that Caron, McClendon, and Kenny transferred Townsend in retaliation for protected behavior.

---

[5] Although Townsend alleges that the transfer was also prompted by his aunt's complaints about the privacy issues and by AAG Motherway's investigation, Townsend has sufficiently shown that his own complaints were a "substantial or motivating factor" behind the transfer, as I explain below.  *See Clayton v. City of Middletown*, 564 F. Supp. 2d 105, 112 (D. Conn. 2008).

[6] I note that the complaint further alleges that, on January 22, 2020, Kenny sent an e-mail to Crandall, stating that "I was reviewing some incidents and [Townsend's] name keeps coming up. Nothing to substantiate with a DR but the facility is recommending he be transferred in a proactive [sic] measure; we feel he is not suitable for an open compound." *See id.* at ¶ 44.  In his motion for a temporary restraining order, Townsend elaborates that his name kept "coming up" because "of his participation in protected activity and conduct (i.e. filing complaints.)." Mot., Doc. No. 16, at 7.

For the above reasons, I will permit the retaliation claim to proceed against Caron, McClendon, and Kenny for further development of the record.

C. Due Process Claim – Restrictive Housing

Townsend also mounts a procedural due process claim, challenging the disciplinary process that followed his "refusing housing" ticket and that resulted in his placement in administrative segregation for fifteen days as well as a 15-day loss of good-time credits. *See* Compl., Doc. No. 1, at ¶¶ 85–99, 113–15. That claim lacks merit.

To state a procedural due process claim, a plaintiff must allege facts showing that: (1) he had a protected liberty interest and (2) he was deprived of that interest without being afforded sufficient due process. *See Walker v. Fischer*, 523 F. App'x 43, 44 (2d Cir. 2013) (citing *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001)). Although "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement," the Supreme Court has held that "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in *Sandin v. Conner*, 515 U.S. 472 [] (1995)." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). As the Supreme Court observed in *Wilkinson*, the *Sandin* Court made clear that the "touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson*, 545 U.S. at 223 (quoting *Sandin*, 515 U.S. at 484). The determination of whether a prisoner has a "protected liberty interest" therefore encompasses a two-part analysis: (i) whether the "alleged deprivation was atypical and significant;" and (2) whether the state has "created a

14

liberty interest by statute or regulation." *Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000) (citation omitted).

In this case, Townsend alleges that he was confined in restrictive housing for fifteen days and lost fifteen days of good-time credits. As an initial matter, the loss of good-time credits affects the overall length of Townsend's imprisonment, and when an inmate challenges the duration of his imprisonment and seeks a determination that he is entitled to immediate or speedier release from that imprisonment, the "sole federal remedy is a writ of habeas corpus." *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973); *see also Heck v. Humphrey*, 512 U.S. 486–87 (1984) (holding that a section 1983 claim is not cognizable when a judgment in the plaintiff's favor would necessarily imply the invalidity of the plaintiff's underlying conviction or sentence, unless the plaintiff can prove that the "sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus"). In *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court made clear that *Heck*'s "favorable termination" requirement "applies to challenges made under § 1983 to procedures used in disciplinary proceedings that deprived a prisoner of good-time credits." *Peralta v. Vasquez*, 467 F.3d 98, 103 (2d Cir. 2006) (citing and discussing *Edwards*).

Applying the foregoing precedent, the Second Circuit in *Peralta* held that, in cases where a prisoner was subject to a disciplinary proceeding that gave rise to two types of sanctions—one that affected the duration of his confinement and the other that impacted the conditions of his confinement—the prisoner can proceed with a section 1983 action challenging the sanctions impacting the conditions of confinement without satisfying the favorable termination rule, but only if "he agrees to abandon forever any and all claims he has with respect to the sanctions that

affected the length of his confinement."  467 F.3d at 100, 104.  Accordingly, Townsend cannot

proceed with his due process claim unless he abandons any challenge to the loss of good-time

credits.

Although I would ordinarily stay the case to ascertain Townsend's agreement to abandon

the challenge to the loss of good time, a stay is not necessary because, even if Townsend

consented, the due process claim would still be dismissed for failure to plausibly allege that the

restrictive housing placement posed an "atypical and significant" hardship.  With respect to the

"atypical and significant" inquiry in restrictive housing cases, courts consider factors such as

"the extent to which the conditions of the disciplinary segregation differ from other routine

prison conditions and the duration of the disciplinary segregation imposed compared to

discretionary confinement."  *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (internal

quotation marks and citations omitted); *see also Reynolds v. Arnone*, 402 F. Supp. 3d 3, 25 (D.

Conn. 2019) ("Atypicality should be measured against the conditions afforded to the general

population within a given prison system, as well as those in routine administrative

confinement.").  The duration of segregated confinement is a "distinct factor bearing on

atypicality and must be carefully considered."  *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir.

2000).

The Second Circuit has noted that solitary confinement of fewer than 101 days could

engender an "atypical and significant hardship" if the conditions "were more severe than the

normal [Special Housing Unit] conditions of [*Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir.

1999)] or a more fully developed record showed that even relatively brief confinements under

normal [restrictive housing] conditions were, in fact, atypical."  *See Palmer v. Richards*, 364

F.3d 60, 65–66 (2d Cir. 2004).  Moreover, "[i]n the absence of a detailed factual record," the

Second Circuit has "affirmed dismissal of due process claims only in cases where the period of time spent in [restrictive housing] was exceedingly short—less that the 30 days that the *Sandin* plaintiff spent in [restrictive housing]—and there was no indication that the plaintiff endured unusual [restrictive housing] conditions." *Id.*

In his complaint, Townsend alleges that he was confined in restrictive housing for fifteen days, where he was afforded only five hours of recreation per week in a small room and could shower three times a week at most. Compl., Doc. No. 1, at ¶ 114. Moreover, he was deprived of out-of-cell meals, outdoor recreation, telephone use, social visits, religious services, and inmate contact, among other things. *Id.* Inmates in the general population, on the other hand, are allegedly allowed twelve hours of recreation per week, two hours of outside recreation per week, six calls a day, visits four times a week, showers twelve times a week, out-of-cell meals, religious services twice a week, a spacious recreational area, and inmate contact. *Id.*

Although Townsend's conditions in restrictive housing undoubtedly seem onerous, they do not appear more so than those experienced by the plaintiff in *Sandin*, where the Supreme Court held that "[t]he regime to which [the prisoner] was subjected . . . was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." 515 U.S. at 487. There, the incarcerated plaintiff was confined in disciplinary segregation for 30 days, during which time he was likewise isolated from the other inmates and only allowed around 50 minutes a day to exercise and shower. *Id.* at 494. In addition, similar to the general population in Cheshire, the general prison population in *Sandin* was subjected to less restrictive circumstances: they were permitted to leave their cells for up to twelve hours each day to work, take classes, and mingle with others. 515 U.S. at 486 n.8, 494.

Townsend's conditions in restrictive housing are also comparable to those in *Sealey*, where the Second Circuit concluded that the plaintiff had not carried his burden of proving that his 101-day confinement in restrictive housing met the *Sandin* standard of atypicality. *Sealey*, 197 F.3d at 589–90. In that case, the plaintiff was allegedly confined to his cell for twenty-three hours a day, was limited to three showers a week, had restricted library privileges, and had no telephone privileges. *Id.* at 581, 587.

Even if the deprivations experienced by Townsend posed a hardship greater than that experienced by the incarcerated plaintiffs in *Sandin* or *Sealey*, that difference is offset by Townsend's shorter period of confinement in solitary; Townsend was placed in restrictive housing for half the time as the plaintiff in *Sandin* and less than a fifth of the time as the plaintiff in *Sealey*. *See Arce v. Walker*, 139 F.3d 329, 337 (2d Cir. 1998) ("Even assuming that the additional deprivations of communal religious services and out-of-cell exercise for 15 days caused the level of Arce's hardship to exceed the hardship at issue in *Sandin,* any difference is significantly offset by the relative brevity of Arce's segregation which was 12 days shorter than the 30 day segregation in *Sandin*.").

For those reasons, even when drawing all reasonable inferences in his favor, Townsend has failed to raise a plausible inference that his conditions in restrictive housing were atypical under *Sandin*. His due process claim arising out of the restrictive housing placement is therefore **dismissed** pursuant to 28 U.S.C. § 1915A(b)(1).

### D. Due Process Claim – Transfer

To the extent Townsend brings a due process claim arising out of his transfer to Cheshire, that claim is likewise not colorable. It is well-established that an inmate does not have a right to be housed in a particular prison facility. *See Meachum v. Fano*, 427 U.S. 215, 224–25 (1976)

(holding that a transfer among correctional facilities does not implicate a "liberty" interest within the meaning of the due process clause, even if the new facility is "more disagreeable"); *Jarecke v. Hensley*, 552 F. Supp. 2d 261, 265 (D. Conn. 2008) ("Inmates have no constitutionally protected right to be confined in any particular correctional facility or housing unit.").  Because Townsend had no cognizable liberty interest that was implicated by his transfer, the claim that the defendants violated his due process rights when they transferred him to Cheshire is **dismissed** pursuant to 28 U.S.C. § 1915A(b)(1).

E.  Administrative Directive Claim

To the extent Townsend challenges Maiga's failure to address his grievance about the transfer to Cheshire in accordance with administrative directives, that claim also fails.  First, the failure to comply with an administrative directive does not on its own give rise to a claim under section 1983.  *Harris v. Taylor,* 441 F. App'x 774, 775 (2d Cir. 2011); *see also Osuch v. St. John*, 2018 WL 5778243, at *4 (D. Conn. Nov. 2, 2018) ("Because a failure to follow a Department of Correction directive does not give rise to a section 1983 claim, any claim based on St. John's alleged violation of Administrative Directives 8.1 and 8.5 is dismissed.").  Moreover, Connecticut's grievance policies do not "create federally protected due process entitlements to specific state-mandated procedures."  *See Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (internal citation omitted) (reasoning that a prisoner's argument that "defendants violated his due process rights by restricting his access to the prison's grievance procedures confuses a state-created procedural entitlement with a constitutional right").

For those reasons, I **dismiss** the administrative directive claim pursuant to 28 U.S.C. § 1915A(b)(1).

F.   Eighth Amendment Claim

Lastly, Townsend contends that the defendants were deliberately indifferent to his safety by failing to take appropriate steps to protect him from Downing.  Compl., Doc. No. 1, at ¶¶ 72–84.  That claim is cognizable.

To state a claim for deliberate indifference under the Eighth Amendment, an incarcerated plaintiff must demonstrate both an objective and subjective element.[7]  To meet the objective element, the prisoner must allege that he or she was incarcerated under conditions that resulted in a "sufficiently serious" deprivation of a life necessity or basic human need, or under conditions that posed "a substantial risk of serious harm" to his or her health or safety.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

There is no "bright line test" to determine whether a risk of serious harm is "substantial" for Eighth Amendment purposes.  *See Lewis v. Siwicki*, 944 F.3d 427, 432 (2d Cir. 2019).  Instead, a court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk," that is, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate."  *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original).  When evaluating a claim for deliberate indifference to safety, courts consider "the facts and circumstances of which the official was aware at the time he acted or failed to act."  *Hartry v. County of Suffolk*, 755 F. Supp. 2d 422, 436 (E.D.N.Y. 2010) (internal quotation marks and citation omitted).

---

[7] Records from the Department of Corrections show that Townsend was sentenced in 2002.  *See Inmate Information*, DEP'T OF CORR., http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=243804 (last visited October 27, 2020).  Thus, he was a sentenced inmate at all times relevant to this action and I evaluate his deliberate indifference claim under the Eighth Amendment.  *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

To meet the subjective element, a prisoner must allege that the defendants possessed culpable intent—that is, that they knew that the prisoner faced a substantial risk to his or her health or safety and disregarded that risk. *See Farmer*, 511 U.S. at 834, 837. Thus, an allegation of "mere negligen[t]" conduct is insufficient. *Id.* at 835. The subjective element instead requires that an inmate demonstrate that the defendants acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).

In the present case, Townsend alleges that he was transferred to Cheshire, where Downing, an inmate with whom he had a separation profile, was housed. *See* Doc. No. 1, at ¶ 72. While at Cheshire, Townsend was allegedly relayed threatening messages from Downing and had to run away from Downing on two occasions to avoid a confrontation. *Id*. at ¶¶ 81, 116.

Construing the complaint liberally and drawing all reasonable inferences in Townsend's favor, those allegations are sufficient to satisfy the objective requirement. Separation profiles are "one of DOC's established means 'to reduce any substantial risk to [inmate] personal safety'— that is, to ensure inmate safety in accordance with the Eighth Amendment." *Coover v. Chapdelaine*, 2016 WL 1532232, at *2 (D. Conn. Apr. 15, 2016) (citing Department of Correction Administrative Directive 9.9). It is therefore plausible that housing Townsend at a facility that also housed an inmate with whom he had a separation profile placed Townsend at a substantial risk of serious harm.

In addition, Townsend has sufficiently pled the subjective requirement with respect to Butricks, Warren, Maiga, Hewitt, and Crandall. The complaint alleges that Maiga, Hewitt, Crandall were aware of the separation profile but approved Townsend's transfer to Cheshire and deleted the profile from the CAIT system after Townsend began to file complaints requesting a

21

transfer.  *See* Compl., Doc. No. 1, at ¶ 76.  Moreover, according to the complaint, Maiga, Hewitt, and Crandall have a history of punitively transferring Townsend to facilities that house inmates with whom he has separation profiles.  *See id*. at ¶¶ 78–80.  The complaint alleges, further, that Townsend informed Butricks that he feared for his safety in the general population, and that Townsend told Warren that he feared for his safety because of his past confrontations with Downing.  *Id*. at ¶¶ 77, 87.

Although Townsend was placed in restrictive housing for fifteen days, which might have mitigated the risk of harm during that time, the complaint raises a plausible inference that the defendants failed to take any other steps to protect Townsend until they transferred Downing out of Cheshire months later, on September 10, 2020.  *See* Decl., Doc. No. 15-1, at ¶ 4 (Maiga Declaration) (noting that Downing was transferred out of Cheshire on September 10, 2020).  Accordingly, the complaint sufficiently pleads that each of the foregoing defendants knew that Townsend faced a substantial risk to his safety and disregarded that risk.

For the foregoing reasons, the Eighth Amendment deliberate indifference claim against Butricks, Warren, Maiga, Hewitt, and Crandall may proceed.

## IV.    Conclusion

The case will proceed on the First Amendment retaliation claim against Caron, McClendon, and Kenny; the deliberate indifference to safety claim against Butricks, Warren, Maiga, Crandall, and Hewitt; and any associated state law claims.

All due process claims relating to the disciplinary charges related to the shower curtain incidents, the Fourth Amendment privacy claim, and any related state law claims are **SEVERED** and **DISMISSED** from this action pursuant to Federal Rule of Civil Procedure 21, without prejudice to Townsend asserting them in a separate lawsuit.  All remaining claims are

**DISMISSED** pursuant to 28 U.S.C. § 1915A(b).   Because all claims against Castillo, Comette, Clark, Elmore, Davis, Carlos, Mulligan, McNiel, Cooper, and Berkowski have been dismissed, the Clerk is directed to terminate them as defendants.

The court enters the following additional orders.

(1)     The Clerk shall verify the current work address for defendants Caron, McClendon, Kenny, Butricks, Warren, Maiga, Crandall, and Hewitt with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet containing the Complaint and this Order to each defendant at the address provided within twenty-one (21) days of this Order, and report to the court on the status of the waiver request on the thirty-fifth day after mailing.  If any defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on the defendant in his or her individual capacity and the defendant shall be required to pay the cost of such service.

(2)     The Clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshal Service.  The U.S. Marshal is directed to effect service of the Complaint on defendants Caron, McClendon, Kenny, Butricks, Warren, Maiga, Crandall, and Hewitt in their official capacities at the Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106, within twenty-one (21) days from the date of this order and to file a return of service within thirty (30) days from the date of this order.

(3)     The Clerk shall send Townsend a copy of this Order.

(4)     The Clerk shall send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(5)     The defendants shall file their response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date the waiver forms are sent.  If they choose

to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above.  They also may include all additional defenses permitted by the Federal Rules.

(6)      Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within seven months (210 days) from the date of this order.  Discovery requests need not be filed with the court.

(7)      All motions for summary judgment shall be filed within eight months (240 days) from the date of this order.

(8)      Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed.  If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

So ordered.

Dated at Bridgeport, Connecticut, this 15th day of December 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge