UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TIMOTHY TOWNSEND, JR.,<br>    Plaintiff,<br><br>   v.<br><br>CASTILLO, et al.,<br>    Defendants. | No. 3:20-cv-1241 (SRU) |

### ORDER AND RULING GRANTING MOTION FOR A
### TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Timothy Townsend, Jr., currently confined at Cheshire Correctional Institution ("Cheshire"), filed a motion for a temporary restraining order and preliminary injunction. Townsend principally contends that he was transferred to Cheshire, a maximum-security facility, from Carl Robinson Correctional Institution ("Carl Robinson"), a medium-security facility, in violation of his First Amendment rights. *See* Doc. No. 16. He seeks a temporary restraining order and preliminary injunction directing the Connecticut Department of Corrections ("DOC") to transfer him back to Carl Robinson or "another facility consistent with his risk level." *See* Doc. No. 47, at 1.

Because Townsend has established that he will suffer irreparable harm in the absence of injunctive relief and that there is a clear likelihood of success on his First Amendment retaliation claim, the motion is **granted**.

**I.  Standard of Review**

In the Second Circuit, the same legal standard governs motions for temporary restraining orders and motions for preliminary injunctions. *See Fairfield Cty. Med. Ass'n v. United Healthcare of New England*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd as modified sub*

*nom. Fairfield Cty. Med. Ass'n v. United Healthcare of New England, Inc.*, 557 F. App'x 53 (2d Cir. 2014).  To prevail on a motion for a temporary restraining order, the movant must demonstrate "that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest."  *Glossip v. Gross*, 576 U.S. 863, 876 (2015) (cleaned up).  Irreparable harm exists "'where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.'"  *United States SEC v. Daspin*, 557 F. App'x 46, 48 (2d Cir. 2014) (citation omitted).

Where a movant seeks a "mandatory preliminary injunction that alters the status quo," rather than a "prohibitory injunction seeking only to maintain the status quo," the burden of proof is more stringent.  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011).  In that instance, a movant must demonstrate a "clear" or "substantial" likelihood of success on the merits.  *See Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008).  Because the proposed injunction's impact on the status quo drives the standard, courts must first identify the "'status quo'—that is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'"  *North America Soccer League LLC v. United States Soccer Federation*, 883 F.3d 32, 37 (2d Cir. 2018).

In this case, the "last actual, peaceable uncontested status which preceded the pending controversy" is before Townsend was transferred to Cheshire, when he resided in Carl Robinson.  Any injunction, therefore, would preserve the status quo and is more fairly characterized as prohibitory.  Nonetheless, because Townsend can meet either burden, I will apply the higher standard throughout my analysis.

## II. Procedural Background

On August 25, 2020, Townsend, proceeding *pro se*, filed this case against eighteen correctional officials (collectively, "Defendants"), challenging, *inter alia*, his transfer from Carl Robinson to Cheshire as retaliatory in violation of his exercise of his First Amendment rights. *See* Compl., Doc. No. 1. On September 15, 2020, Townsend filed the instant motion for a temporary restraining order and preliminary injunction. *See* Doc. No. 16. The following day, I issued an order to show cause and directed the government to respond by October 2, 2020. *See* Doc. No. 16. Approximately a week later, on October 22, 2020, I granted Townsend's motion to appoint counsel. *See* Doc. No. 19. The government filed an objection on October 2, 2020, and Townsend's counsel filed appearances on October 19, 2020. *See* Doc. Nos. 26, 29, 30.

On June 21, 2021, after a reply was filed on June 4, 2021,[1] I held an evidentiary hearing.[2] The parties submitted post-hearing briefing on June 28, 2021 and July 7, 2021. *See* Doc. Nos. 59, 63.

## III. Discussion

A. <u>Clear Likelihood of Success on the Merits</u>

To prevail on his First Amendment retaliation claim, Townsend must demonstrate facts showing "(1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018) (internal quotation marks and citations omitted). Because "virtually any adverse action taken

---

[1] In e-mail correspondence with my law clerk, Townsend's counsel cited challenges in collecting information as the reason underlying the delay in filing the reply.

[2] Although not pertinent to the instant motion, I note that, at the hearing, Townsend testified that he continues to face sanctions, including loss of contact with his family for two years, for a ticket that has since been expunged. Tr., Doc. No. 60, at 37–39. I am deeply troubled by that testimony; the error should be rectified immediately if it has not been already.

3

against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed courts to approach retaliation claims with "skepticism and particular care." *Samuels v. Strange*, 2012 WL 4754683, at *5 (D. Conn. Oct. 4, 2012) (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). After carefully considering the entire record before me, I conclude that Townsend has demonstrated a clear likelihood of proving his First Amendment retaliation claim. I address each element in turn.

*First*, Townsend's transfer was likely motivated by his tireless advocacy in his disciplinary and judicial proceedings, as well as by the assistance he furnished to others with their disciplinary proceedings. As I discuss below, all such conduct is constitutionally protected.

As an initial matter, it is black-letter law that Townsend enjoys a right to be free from retaliation for bringing a lawsuit. *See Espinal v. Goord*, 558 F.3d 119, 128–29 (2d Cir. 2009); *see also Colombo v. O'Connell*, 310 F.3d 115, 118 (2d Cir. 2002) ("[T]he right of a private individual to sue and defend in the courts is protected by the First Amendment because it is the right conservative of all other rights [which] lies at the foundation of orderly government."). His filing of cases—no matter how many—and his work litigating those matters are therefore protected. *See* Tr., Doc. No. 60, at 8, 16 (testifying that he has 13 cases pending, which in the DOC has earned him the title of a "jailhouse lawyer").

Townsend's efforts challenging disciplinary tickets are likewise protected. Townsend received two disciplinary tickets at Carl Robinson—one on December 8, 2019 and another on December 12, 2019—for hanging a shower curtain over a bathroom stall in order to cover himself while he used the toilet and for disobeying an order to remove the curtain. *See*

Townsend Decl., Doc. No. 16, at ¶¶ 2–3, 7–8.  He refused to sign informal disposition reports and instead pled not guilty.  Ouellette Decl., Doc. No. 26-1, at ¶ 9.  During the disciplinary hearings that followed, Townsend argued, among other things, that there was no rule that barred inmates from retaining their privacy while using the toilet.  Townsend Decl., Doc. No. 16, at ¶¶ 12, 13; Ouellette Decl., Doc. No. 26-1, at ¶ 9.  Townsend was ultimately found guilty on the first ticket and received a sanction of loss of phone privileges for sixty days; he thereafter filed an appeal, which was denied.  Ouellette Decl., Doc. No. 26-1, at ¶ 9; Tr., Doc. No. 60, at 40:14–21.  The second ticket was dismissed by the hearing officer.  Townsend Decl., Doc. No. 16, at ¶ 10.

It is well-settled that pursuing a grievance about the conditions of confinement qualifies as protected speech.  *See Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) ("it is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983."); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ("In the prison context, we have held that inmates must be permitted free and uninhibited access to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.") (cleaned up).  Here, Townsend challenged a disciplinary ticket and the more restrictive conditions of confinement that might flow from a guilty finding.  Similarly, his appeal of the disciplinary action involved grieving the disciplinary decision and the concomitant punishment that was imposed.[3]  Because Townsend was, at bottom, advancing a grievance about his conditions of confinement, I hold that his challenges against the tickets and disciplinary actions fall squarely within the range of protected First Amendment activity.  *Cf.*

---

[3] Of note, the process for appealing a disciplinary action is the same as for filing a grievance.  *See* STATE OF CONN. DEP'T OF CORR., ADMINISTRATIVE DIRECTIVE 9.5 ("An inmate may file an appeal regarding a disciplinary action in accordance with Administrative Directive 9.6, Inmate Administrative Remedies"); *see* Tr., Doc. No. 60, at 47:14–17 (testifying that filing an administrative appeal is equivalent to filing a grievance).

*Arguijo v. Dennis,* 2009 WL 393957, at *4 (D. Or. Feb. 2, 2009) (implying that grieving the results of a disciplinary hearing is protected conduct).

The assistance Townsend provided to other prisoners with their disciplinary hearings is also protected. Townsend testified that he shared directives and other legal materials with individuals who received disciplinary tickets, and that he occasionally served as a witness in their hearings. *See* Tr., Doc. No. 60, at 16:11–19. At one point at Carl Robinson in 2019, for instance, there was an incident that resulted in six prisoners receiving disciplinary tickets. *See id*. at 40:3–12. Several had asked Townsend to be a witness at their disciplinary hearing, to which he agreed. *See id; see* Tr., Doc. No. 60, at 15–22. Townsend also shared the administrative directive outlining the processes governing disciplinary tickets. Tr., Doc. No. 60, at 41:1–5. Ultimately, five of the tickets were dismissed; the sixth prisoner pled guilty. *See id.* at 40:13–22.

Townsend further testified that he counsels prisoners with disciplinary tickets or grievances to consult with an advisor or the Inmate Legal Assistance Program. *See id.* at 50:3–21. Moreover, he has copies of statutes as well as legal and practice books, and he will "lead somebody in the direction that they need to be in." *See id*.

Townsend's aid to others with disciplinary hearings is protected under the First Amendment. In *Turner v. Safely,* the Supreme Court observed that a prison regulation impinging on a prisoner's constitutional rights is valid "if it is reasonably related to a legitimate penological interest." 482 U.S. 78, 89 (1987); *see also Jones v. N. Carolina Prisoners' Lab. Union, Inc*., 433 U.S. 119, 125 (1977) (explaining that a prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system"). Applying that rule, the *Turner* Court held as reasonable a Missouri rule prohibiting communication between prisoners at different institutions, except for correspondence

6

that was between family members, that concerned legal matters, or that was in the best interest of the involved parties. *See Turner,* 482 U.S. at 81–82, 91–92. The Court announced four factors governing the review of prison regulations: "(i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities." *Covino v. Patrissi*, 967 F.2d 73, 78–79 (2d Cir. 1992) (citing *Turner*, 482 U.S. at 89–90). Although *Turner* involved a generally applicable policy, the Second Circuit has applied the *Turner* test where, as here, the First Amendment retaliation claim arises out of a single incident. *See, e.g., Burns v. Martuscello*, 890 F.3d 77, 92 (2d Cir. 2018) (considering the first *Turner* factor and whether prison officials were engaging in an "exaggerated response").

Fourteen years after *Turner*, in *Shaw v. Murphy*, the Supreme Court "decline[d] to cloak the provision of legal assistance with any First Amendment protection above and beyond the protection normally accorded prisoners' speech" under *Turner*, and held that prisoners do not enjoy heightened constitutional protection "whenever a prisoner's communication includes legal advice." 532 U.S. 223, 230–32 (2001). Courts in this Circuit have disagreed about whether *Shaw* strips prisoners of any constitutional right to furnish legal assistance to others. *Compare Hayes v. Arnone*, 2013 WL 6017334, at *6 (D. Conn. Nov. 13, 2013) (citing *Shaw* for the proposition that a prisoner has "no constitutional right to provide legal assistance to other inmates"), *with Anderson v. Lapolt*, 2009 WL 3232418, at *7 (N.D.N.Y. Oct. 1, 2009) ("*Shaw*'s holding is not that prisoners do not have a protected right to assist each other in legal matters,

7

rather, it is that such activity is not entitled to any *special* protection under the First Amendment.") (emphasis in original); *accord Lashbrook v. Hyatte*, 758 F. App'x 539, 541 (7th Cir. 2019) ("No additional constitutional protection [on top of *Turner*] is afforded prisoners' communication involving legal advice."); *Halverson v. Skolnik*, 2010 WL 3463635, at *3 (D. Nev. Aug. 26, 2010) ("[B]oth assisting other inmates with their legal matters and pursuing legal matters of the inmate's own are protected by the First Amendment").

In my view, the *Anderson* opinion more accurately applies the lessons of *Shaw*. The *Shaw* Court explicitly noted that they were not deciding the question whether "prisoners have *any* First Amendment rights when they send legal correspondence to one another." *Shaw*, 532 U.S. at 228 (emphasis in original). Instead, the Court explained, the question before them was whether a prisoner "possesses a First Amendment right to provide legal advice that *enhances* the protections otherwise available under *Turner*." *Id*. (emphasis added). Answering that question in the negative, the Court held that the proper constitutional test is the one set forth in *Turner*. *Id*. at 232. In light of that language, I read *Shaw* as holding that legal assistance furnished by prisoners is not entitled to *special* protection under the First Amendment beyond *Turner*; it did not hold that communications involving legal advice from prisoner to prisoner triggers no constitutional protection. Whether Townsend's actions are protected for purposes of his First Amendment retaliation claim is therefore contingent on whether Townsend has demonstrated that the prison's response was "exaggerated" under *Turner*, i.e., whether the response to inmate communications "is reasonably related to legitimate and neutral government objectives." *Shaw*, 532 U.S. at 228 (citing *Turner*). I hold that he has carried that burden.

Even after according due deference to Defendants, I believe that Townsend has sufficiently demonstrated that transferring him in response to the assistance he provided to other

prisoners facing disciplinary tickets was not reasonably related to any legitimate penological interest. Applying the first factor in *Turner*, I cannot identify a valid, rational connection between prohibiting Townsend from offering such aid and a legitimate penological goal. At the hearing, Jason Ouellette, a lieutenant at Carl Robinson, testified about the unique risks that an open-compound facility presents, such as the possibility of escape and dissemination of contraband. *See* Tr., Doc. No. 60, at 63:12–14, 69:1–8; 73:11–12. But Ouellette did not, with any specificity, tie those risks to Townsend. Ouellette's bare assertions in his affidavit that Townsend's role as an advocate during the disciplinary hearing process "interrupted the orderly administration of the disciplinary process" and "frustrated the facility ability to maintain order and discipline" do not suffice. Ouellette Decl., Doc. No. 26-1, at ¶ 12. The Constitution requires more than unfounded concerns about "order and discipline" when prison officials trample on the constitutionally enshrined rights of those in their care.

To the extent Defendants attribute Townsend's conduct to an increase in disciplinary hearings, Defendants do not explain how any such increase compromised penological interests.[4] Quite the opposite, Ouellette testified how it was "fine" for Townsend to challenge his disciplinary reports and that prisoners were entitled to do so. Tr., Doc. No. 60, at 64:16–24; 87:21–25.

Defendants also appear to posit that, because Townsend was exhibiting influence over other prisoners through their disciplinary hearings, there was a risk that Townsend would leverage his control to direct prisoners to engage in illicit behavior. That concern is far too conjectural to withstand even the minimal level of scrutiny that I must apply. Although *Shaw* observed that "[p]risoners have used legal correspondence as a means for passing contraband and

---

[4] At the hearing, Ouellette clarified that the number of hearings—not disciplinary tickets—was attributable to Townsend. *See* Doc. No. 60, at 78:12–79:5.

9

communicating instructions on how to manufacture drugs or weapons," there is no indication that such concern was implicated by Townsend's conduct here.  *Shaw*, 532 U.S. at 231.  Indeed, there are no entries related to any such "incitement of other inmates in his unit" in Townsend's Official Disciplinary History.  *See* Townsend Decl., Doc. No. 47-1, at ¶ 5.

To be sure, Ouellette represented that, on January 8, 2020, Townsend "verbally interjected" himself into a situation where a prisoner was becoming "verbally abusive" and attempted to have other prisoners in the unit follow his lead against the orders of the staff.  *See* Ex. A, Doc. No. 26-1, at ¶ 13.  I do not find that testimony credible.  In his affidavit, Townsend avowed that he has no recollection of that incident, and he persuasively testified at the hearing that he does not remember anything unusual taking place that day.  *See* Townsend Decl., Doc. No. 47-1, at ¶ 1; Tr., Doc. No. 60, at 12:15–16.  Defendants have, further, not introduced any documentation corroborating the episode.  Townsend's disciplinary history contains no entry concerning a January 8, 2020 incident, and particularly in light of the tickets that Townsend received for seemingly less disruptive conduct, the absence of any record suggests to me that Townsend either did not act that way or, if he did, he did not pose a threat to prison security as Ouellette maintains.

For those reasons, transferring Townsend in response to the aid he provided to other prisoners facing disciplinary tickets—many of which were ultimately dismissed—was not reasonably related to any legitimate penological interest and represented an exaggerated response under *Turner*.  Other courts in this Circuit addressing similar fact patterns have reached the same conclusion.  *See, e.g.*, *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) (holding that retaliation for cooperating with an administrative investigation of alleged incidents of prisoner abuse implicated the petitioner's First Amendment rights); *Auleta v. LaFrance*, 233 F. Supp. 2d 396,

400 (N.D.N.Y. 2002) (holding that the placement of a prisoner in segregation because he provided legal assistance to another prisoner as part of his assigned work activities was not reasonably related to legitimate penological interests); *Ames v. New York Dep't of Corr. & Cmty. Supervision*, 2015 WL 4126326, at *4 (N.D.N.Y. Mar. 24, 2015) ("Plaintiff's retaliation claim based upon his protected act of providing legal assistance to other inmates is not legally insufficient."); *Ahlers v. Grygo*, 2009 WL 3587483, at *4 (E.D.N.Y. Oct. 27, 2009) ("Reporting the wrongdoing of corrections officers and other prison officials, and providing legal assistance to others who report such wrongdoing, qualifies as protected speech under the First Amendment"); *accord Wisniewski v. Fisher,* 857 F.3d 152, 156-57 (3d Cir. 2017) (holding that a prisoner "plausibly alleged that his conduct in assisting his assigned inmate prepare a grievance, which was both pursuant to his job duties and in accordance with prison regulations, was not inconsistent with legitimate penological interests, and therefore could fall within the limited First Amendment rights that prisoners retain"); *see also Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009) ("Providing an eyewitness account (or an aural account, as in this case) of an incident where prison officials are alleged to have mistreated an inmate who was gravely ill (and later died) is not inconsistent with legitimate penological interests."). Townsend's assistance was, therefore, protected for purposes of his First Amendment retaliation claim, and the first element of his claim has been satisfied.

*Second*, the Second Circuit has held that "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Wrobel v. County of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) (citation omitted). As relevant here, binding precedent teaches that the transfer of a prisoner to another prison facility—even to another prison facility with comparable conditions—could rise

to the level of an adverse action for purposes of a First Amendment retaliation claim. *See Smith v. Levine*, 510 F. App'x 17, 21 (2d Cir. 2013) ("We had stated, at least as early as 1998, that, while '[a] prisoner has no liberty interest in remaining at a particular correctional facility,' prison authorities 'may not transfer an inmate in retaliation for the exercise of constitutionally protected rights.'") (citing *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998)).

With those principles in mind, the record easily establishes that Townsend was subjected to an adverse action. It is without dispute that Townsend was transferred from an open-compound facility with dormitory housing to a Level 4 facility with considerably harsher conditions of confinement. At Cheshire, prisoners are housed in circumstances akin to solitary confinement: they are confined to their cells for up to 23 hours a day and have access to few programmatic and recreational opportunities. *See* Tr., Doc. No. 60, at 23–25. Prisoners at Cheshire are therefore in social isolation for nearly the entire day, with little time to shower, exercise, get fresh air, or see their families. Moreover, Townsend was removed from the Pell Grant College Program for the Spring 2020 term as a result of the transfer, and he is not able to participate in college courses at Cheshire until the next two-year enrollment cycle. *See* Doc. No. 47-1, at ¶ 6. The consequences that Townsend was subjected to as a result of his transfer to Cheshire would certainly deter any prisoner from exercising their First Amendment rights.

Significantly, by nature of the restrictive conditions at Cheshire, Townsend's speech was and continues to be chilled. Townsend testified at length about his confinement at Cheshire hindered his ability to litigate his cases: he only has access to the library once every other week, which slows his legal research, and he is unable to regularly communicate with other prisoners and officers, which hampers his investigatory efforts. And, because he is only allowed out of his cell for one or two hours a day, he has a narrow period of time to use the one typewriter that is

available for 100 prisoners. Indeed, as I discuss next, limiting Townsend's First Amendment rights was the very purpose behind his transfer to Cheshire. The second element is, therefore, clearly met as well.

*Third*, Townsend has adequately established a causal connection between the transfer on the one hand and his advocacy and assistance to fellow prisoners on the other. Turning first to Townsend's aid to others with their disciplinary tickets, the record readily establishes that such conduct was a motivating factor animating the transfer. Indeed, Ouellette testified as much; he stated that he recommended Townsend's transfer "due to his known behavior to advocate and interject into incidents not involving him." Tr., Doc. No. 60, at 82:5–10. Ouellette later reiterated that Townsend was recommended for a transfer because, among other things, Townsend told other prisoners that he would assist them with their disciplinary hearings. *See id.* at 89:11–19. In his affidavit, Ouellette again noted that Townsend's role as "an advocate or 'jailhouse' lawyer" during other prisoners' disciplinary hearings had "frustrated the facility's ability to maintain order and discipline among the impacted inmate population." *See* Ex. A, Doc. No. 26-1, at ¶¶ 11, 12.

The prison's displeasure with the assistance Townsend supplied to others throughout the disciplinary process was also conveyed through Townsend's testimony. Townsend testified that, after he served as a witness for the incident resulting in six disciplinary tickets as described above, the administration was "upset" and the disciplinary report investigator instructed him that he "shouldn't be helping these guys" because "they're only using [Townsend]" and were "gloating" when they successfully challenged the tickets. *See* Tr., Doc. No. 60, at 41:11–16.

Moreover, on January 22, 2020—one day prior to the transfer—Deputy Warden Kenny allegedly sent an e-mail to the Office of Classification and Population Management ("OCPM"),

13

stating: "I was reviewing some incidents and [Townsend's] name keeps coming up. Nothing to substantiate with a DR but the facility is recommending he be transferred in a proactive measure; we feel he is not suitable for an open compound." *See* Townsend Decl., Doc No. 16, at ¶ 44. It is apparent that Townsend's name kept "coming up" because he was a frequent witness in others' hearings and because he challenged his own disciplinary tickets with success; no other explanation was proffered.

Temporal proximity also supports causation in this case. *See Jumpp v. Terranova*, 2016 WL 2858775, at *2 (D. Conn. May 16, 2016) (explaining that temporal proximity, although not sufficient to state a retaliation claim, can support the existence of a causal connection). According to Ouellette, there was an uptick in disciplinary hearings in November 2019 and, sometime between then and January 2020, he learned that Townsend was offering assistance to other prisoners in disputing those tickets. Tr., Doc. No. 60, at 74:14–75:19. Ouellette recommended Townsend's transfer soon thereafter, on January 23, 2020.

Townsend had also fought disciplinary tickets of his own shortly before he was transferred. Townsend received a ticket on December 8, 2019 and on December 12, 2019 for hanging a shower curtain over a bathroom stall in order to cover himself while he used the toilet and for disobeying an order to remove the curtain, both of which he challenged. Although it is not clear when the hearing for the second ticket took place, the hearing for the first ticket occurred on December 24, 2019, merely a month before the transfer. Townsend's appeal following that hearing doubtlessly occurred even closer to the date of the transfer.

With respect to Townsend's advocacy in court, the statements of Warden Butricks provide a sufficient link between such conduct and the transfer. Townsend credibly testified that, after he was moved to Cheshire, he asked Butricks on numerous occasions why he was so

14

transferred. Tr., Doc. No. 60, at 15:3–9. Although Butricks told Townsend at first that he did not know the answer, Butricks later advised Townsend that no facility wanted to house him because of his "litigious history." *Id*. That testimony aligns with the documentary evidence: on March 27, 2020, Butricks e-mailed various DOC personnel asking for background information regarding why Townsend was transferred. *See* Pl's Ex. 5. Butricks was thereafter connected with Kenny, who responded that he would give Butricks a call to discuss the issue. *Id*. It appears, then, that the information that Butricks relayed to Townsend derived from Kenny and was therefore reliable, considering that Kenny was directly involved in the decision to transfer Townsend. Moreover, the record establishes that Townsend had a reputation for being litigious; in an e-mail dated April 21, 2020 that discussed an unrelated complaint, for instance, Butricks wrote, "we all know [Townsend] is a litigious inmate." *See* Pl's Ex. 4.

In light of the foregoing evidence, Townsend has shown a clear likelihood that his advocacy on his own behalf in administrative and judicial proceedings, as well as the support he offered to others with their administrative hearings, were "substantial or motivating" factors behind the transfer.[5] *Clayton v. City of Middletown*, 564 F. Supp. 2d 105, 112 (D. Conn. 2008). The third element of Townsend's retaliation claim is thus clearly satisfied as well.

---

[5] I do not find credible Ouellette's testimony that Townsend's transfer was prompted in part by Townsend's possession of a list of staff member names and uniform sizes, principally because that list was found nearly a year before the transfer, on March 19, 2019. *See* Pl's Ex. 8.

Ouellette further testified that, sometime between November 2019 and January 2020, he learned that Townsend was instructing others to pursue disciplinary hearings. Tr., Doc. No. 60, at 86:1–21. I also do not find that testimony reliable and therefore decline to credit it. As a preliminary matter, Ouellette's testimony is based on double hearsay; Ouellette testified that one of the officers, upon his direction, asked a prisoner why he was fighting a disciplinary report, to which the prisoner responded that Townsend had directed him to do so and had stated that he would provide support to that end. *See id*. at 74:16–25. Moreover, Townsend credibly testified that he does not tell individuals what to do with disciplinary reports; he merely offers resources. *See id*. at 48:8–20.

Regardless, even if Townend did so direct others, and even if that behavior, along with the list of officer names and uniform sizes, did partly drive the transfer, my conclusion that Townsend's protected conduct was a substantial factor in the transfer decision still stands.

I note further that the riot that Ouellette referenced at the hearing occurred in April 2020, after Townsend left Carl Robinson. Moreover, Townsend's disciplinary tickets for possessing contraband were issued after he was transferred. Those incidents are therefore irrelevant.

15

Further illustrating that Townsend's transfer was not motivated by safety concerns, multiple correctional officers, both before and after Townsend's transfer, flagged Townsend's lack of disciplinary records and his Level 2 security classification. In the e-mail recommending Townsend's transfer, Kenny remarked that none of the incidents for which Townsend's name kept appearing were "substantiate[d] with a [disciplinary report]." *See* Townsend Decl., Doc. No. 16, at ¶ 44. Further, in Butricks's March 27, 2020 e-mail inquiring why Townsend was transferred to Cheshire, he noted that Townsend was a level 2 prisoner. Pl. Ex. 5. Butricks again highlighted that Townsend was transferred as a level 2 inmate with no disciplinary record in his e-mails dated April 21, 2020 and May 15, 2020.[6] Pl. Ex. 4. That correspondence suggests that it was atypical for a Level 2 prisoner to be housed at Cheshire and that documentation explaining the reasons behind the transfer was not readily available. The unusual nature of the transfer is buttressed by the fact that less than one-third of the population at Cheshire consists of individuals with an overall risk level of three or lower. *See* Doc. No. 59, at 2, 51.

In sum, there is a strong likelihood that Townsend's transfer was animated by constitutionally protected conduct. Townsend has, therefore, demonstrated his substantial likelihood of success on his First Amendment retaliation claim.

B. <u>Irreparable Harm</u>

Townsend has also carried his burden of showing that, absent injunctive relief, he will suffer a clear likelihood of irreparable harm. In *Elrod v. Burns*, 427 U.S. 347, 374 (1967), the Supreme Court announced that "[t]he loss of First Amendment freedoms, for even minimal

---

[6] I note that this statement is at odds with Ouellette's and Townsend's representations that Townsend was classified as an overall risk level 3 at the time he was transferred to Cheshire. Following his transfer, however, he was lowered to an overall risk level of 2; his security level was raised back to 3 a few months later. *See* Doc. No. 26-2, at ¶¶ 28, 29.

16

periods of time, unquestionably constitutes irreparable injury." Notwithstanding the *Elrod* Court's capacious language, the Second Circuit has not always presumed irreparable harm when presented with claims of First Amendment violations. In some instances, such as "where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech," the Second Circuit has required the plaintiff to demonstrate that the challenged action has had or likely will have an actual chilling effect on speech. *Bronx Household of Faith v. Bd. of Educ. of City of New York,* 331 F.3d 342, 350 (2d Cir. 2003). Accordingly, in those cases, the showing of irreparable harm stands or falls with the First Amendment claim. *See SAM Party of New York v. Kosinski,* 987 F.3d 267, 278 (2d Cir. 2021) (cleaned up) ("[t]he presence of irreparable injury to First Amendment rights . . . turns on whether the plaintiff has shown a clear likelihood of success on the merits") .

Here, even if irreparable harm cannot be presumed, Townsend has established a strong likelihood of succeeding on the merits of his First Amendment claim as discussed above. The element of irreparable harm is therefore met as well.

That Townsend brought this lawsuit eight months after the transfer does not compel a conclusion to the contrary, because the record evinces compelling reasons for the delay. *See Lazor v. Univ. of Connecticut*, 2021 WL 2138832, at *7 (D. Conn. May 26, 2021) ("[T]he Second Circuit has recognized an exception for when a delay is adequately explained, such as when the delay is a product of good faith efforts to investigate the underlying cause of action."). As discussed above, the restrictive conditions of confinement at Cheshire rendered it extremely challenging for Townsend to litigate his cases. The delay was therefore brought about at least in part by the retaliatory transfer, and I decline to penalize Townsend for it.

Further, the challenges Townsend faced in litigating his cases were surely compounded by the COVID-19 pandemic, as evidenced by the fact that the library was closed for a period of time at the pandemic's onset. *See* Tr., Doc. No. 60, at 116:4–8. Townsend was, moreover, required to exhaust his administrative remedies prior to filing the lawsuit, which he testified could take up to three months. *See* Tr., Doc. No. 60, at 6:23–7:8. The delay was therefore adequately justified and does not weigh against a finding of irreparable harm.

C. Balance of Equities

The third element—the balancing of equities—also favors injunctive relief. As I explained above, the record fails to illustrate how Townsend's confinement in a less restrictive facility would implicate security or other legitimate concerns. Although David Maiga, the director of the DOC Offense Classification and Population Management Unit, testified that Townsend's possession of contraband following the transfer raised concerns about Townsend residing in an open-compound facility, the fact remains that Townsend is classified at a risk level of 3 and should be housed at a facility consistent with that risk level—not in what amounts to solitary confinement.

Moreover, any such concerns must be weighed against Townsend's constitutionally-protected interest in free speech, which continues to be infringed by his confinement in Cheshire. Again, because of Cheshire's restrictive conditions, Townsend is not able to access the library as frequently as he did in Carl Robinson, he is limited in his ability to communicate with correctional staff and other prisoners regarding facts needed to advance certain grievances, and he is unable to participate in college courses. Townsend Decl., Doc. No. 47-1, at ¶¶ 6–8.

For those reasons, the balance of harms tips decidedly in Townsend's favor. *See Simmat v. Manson*, 535 F. Supp. 1115, 1119–20 (D. Conn. 1982) ("In the absence of any evidence

demonstrating that an immediate transfer is the only way to protect [the prisoner], the court finds that the balance of hardships does weigh in favor of plaintiff's first amendment interests.").

D. Public Interest

Finally, the public interest is served by issuance of the preliminary injunction. Here, the public interests lies in protecting Townsend's First Amendment rights—the bedrock of our liberties—and that interest would only be furthered by the preliminary injunction. *SAM Party of New York v. Kosinski,* 987 F.3d 267, 278 (2d Cir. 2021) ("Certainly, securing First Amendment rights is in the public interest.") (cleaned up); *A.H. by & through Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021) ("the public interest is well served by the correction of this constitutional harm").

IV. Conclusion

For the reasons set forth, Townsend has carried his burden of proving that he will suffer irreparable harm in the absence of injunctive relief and that he enjoys a clear likelihood of success on the merits of his First Amendment claim. Therefore, a temporary restraining order to transfer Townsend back to Carl Robinson or to another facility consistent with his risk level shall issue.

Because Defendants did not request a bond, and because Townsend appears incapable of posting a bond, the order shall issue without bond.

So ordered.

Dated at Bridgeport, Connecticut, this 4th day of August 2021 at 5:20 p.m.

Stefan R. Underhill
United States District Judge